UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          :
                                  :
        v.                        :
                                  :    FILE NO. 1:06CR151-1
JONATHAN BARTON                   :
_____  :

RULING ON MOTIONS TO SUPPRESS AND DISMISS
(Papers 12, 13 and 20)

In an indictment filed December 22, 2006, defendant Jonathan Barton is charged with one count of possession with intent to distribute more than five grams of cocaine, and one count of knowingly possessing a firearm in furtherance of drug trafficking.  The indictment also seeks forfeiture of cash seized contemporaneously with the defendant's arrest.  See Paper 1.

The defendant has filed a motion to suppress all statements and physical evidence obtained as a result of his allegedly illegal stop and detention on April 19, 2006.  On June 20, 2007, the Court conducted a hearing and reviewed the audio portion of a video of the relevant events made by a police vehicle's camera. For the reasons set forth below, the defendant's Motions to Suppress and Dismiss are DENIED.

Background

Upon review of the testimony and evidence presented at the hearing, the Court finds the following:  At all relevant times, South Burlington Police Officer Jack O'Connor was assigned to the

1

federal Drug Enforcement Administration Task Force (hereinafter "DEA"). Because South Burlington's Route 7 has many hotels and motels, the DEA knows this area to be a route for out-of-state drug traffickers. Accordingly, Officer O'Connor frequently patrols the parking lots of local motels on Route 7, looking for suspicious activity.

Around 8:20 p.m. on April 19, 2006, Officer O'Connor arrived at the Ho Hum Motel on Route 7 in South Burlington. At the time, he was conducting a drug-related investigation unrelated to this case and involving William Dunn, a known drug-dealer. He noticed three cars parked in front of Room 36, which he recognized as the room being used by Dunn. He called for back-up, and Officer Jamie Mills responded.

No one emerged when the officers knocked on the door of Room 36. While the officers were in the parking lot, they observed a Volkswagen Jetta enter the motel parking area at approximately 8:30 p.m. Both the driver, later identified as Joelyne Smith, and the passenger, defendant Jonathan Barton, exited the car.

It was dark, and the defendant had a cap pulled down over his head. Viewing him from a distance, O'Connor believed Barton had the same physique as William Dunn, so Officer O'Connor approached the couple and asked whether they had a room at the motel. Smith indicated they were about to get a room, a suspicious answer considering that the couple had parked near

2

Room 36, as far away from the hotel's check-in office as was possible.

The defendant stood nearby as O'Connor and Smith conversed. When Barton finally spoke, O'Connor realized he was not Dunn. However, he could smell marijuana on Barton, and upon closer inspection, Barton appeared stoned, his eyes red and watery.

During this brief conversation, Barton threw the butt of a cigarette he was smoking to the ground.  Officer O'Connor chastised him for littering, and asked if he had identification. Barton indicated he did not.  When asked to give his name and date of birth, Barton responded "Mike Brunson," born "March 3, 1982"; he could not remember his Social Security number.

Barton did not have a driver's license, and when asked again his date of birth, the defendant stated "March 3, 1983."  Because of the defendant's lack of identification and the fact that he provided two different years of birth, Officer O'Connor concluded Barton was probably lying about his identity.

While Barton was being questioned, Smith repeatedly interrupted the discussion, leading O'Connor to believe she was trying to protect Barton.  During his conversation with Barton and Smith, Officer O'Connor noticed a coat on the vehicle's passenger seat, through the open passenger-side door.  Underneath the jacket, O'Connor observed an empty pistol holster, which gave him concern that the defendant was armed.

O'Connor frisked the defendant and felt a hard object in one of his rear pockets.  The object proved to be a clip of ammunition for a semi-automatic pistol.  The officer also felt a large bulge in the defendant's front pocket, which based on his DEA Task Force experience, he determined was probably a large wad of cash commonly carried by drug dealers.  Officer O'Connor asked the defendant how much money he had, and the defendant indicated he did not know.  When the officer asked to see the money, the defendant showed him $1852, mostly in $20 denominations.

Barton gave Officer O'Connor permission to examine the jacket in the car.  Patting the outside of the jacket, O'Connor felt three golf-ball sized lumps which seemed to have been placed in the lining, rather than a pocket, of the jacket.  Based on his experience, O'Connor believed the lumps were hidden bags of crack cocaine.

The defendant was handcuffed and when asked how much cocaine was in his jacket, the defendant requested to speak with Officer O'Connor privately, so that Smith could not hear.  The defendant indicated he had been selling heroin in Barre, but had switched to selling crack in Burlington because Barre was "dangerous."

Barton subsequently consented to a full search of his jacket.  Inside the lining, O'Connor retrieved approximately 20 grams of crack cocaine, and then asked the defendant where his

gun was.   In response, Barton indicated it was under the passenger seat of the car.

Explaining he would get a search warrant if necessary, O'Connor sought and received written consent from Smith to search the vehicle, and the loaded gun was found under the passenger seat.

The defendant was transported to the police station, where he executed a written waiver of his <u>Miranda</u> rights and confessed to dealing drugs.

<u>Discussion</u>

Barton asserts Officer O'Connor illegally stopped him in the Ho Hum Motel parking lot.   The Court, however, finds Officer O'Connor's decision to stop Smith and Barton in the motel parking lot was proper.

The fact that Officer O'Connor approached Smith and Barton and asked them questions neither constituted a seizure, nor did it violate the Fourth Amendment.   <u>See</u> <u>United States v. Hooper</u>, 935 F.2d 484, 489-90 (2d Cir. 1991); <u>see</u> <u>also</u> <u>United States v. Sharpley</u>, 181 Fed. Appx. 64 (2006).   "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a 'seizure' has occurred." <u>Terry v. Ohio</u>, 392 U.S. 1, 20 n.16 (1968).

Furthermore, after Officer O'Connor's initial approach, the defendant's behavior provided reasonable suspicion of criminal activity, thereby first justifying a limited stop, then his arrest.  It is well established that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  <u>Id.</u> at 22.  Thereafter, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."  <u>Id.</u> at 24.

After Officer O'Connor approached Barton and Smith, he developed an independent basis for detaining and questioning them.  Smith was deceptive and evasive when questioned about their reason for parking so far away from the motel's check-in area and so close to the room of a known drug-dealer.  Also, Smith seemed particularly intent on protecting the defendant, whose face was partially hidden.

In addition, in O'Connor's presence, the defendant committed a littering violation by throwing to the ground his cigarette butt.  <u>See</u> 24 V.S.A. § 2201(a)(1).  Although littering is not a

traffic violation, it is similar in that it is a civil infraction.  See Whren v. United States, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred").  When observed, Barton looked high and exuded the odor of marijuana.  See United States v. Jenkins, 452 F.3d 207, 214 (2006).  In plain view in the vehicle's front passenger seat where Barton had been sitting was an empty gun holster.  All these circumstances provided Officer O'Connor reasonable suspicion to believe the defendant was involved in criminal activity.  See United States v. Sokolow, 490 U.S. 1, 8-9 (1989) ("reasonable suspicion" is judged by the totality of the circumstances which suggest "criminal activity was afoot") (citations and quotations omitted).

The fact that Officer O'Connor was mistaken in his initial impression that the defendant was Dunn does not alter this conclusion.  "The constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts."  See Jenkins, 452 F.3d at 212. From afar, the defendant resembled a known drug-dealer, and he was physically present in an area where drug dealing was known to occur.  Under these circumstances, the stop was proper, and the drugs subsequently found supplied the probable cause to support his arrest.  Id. at 212-13.

Moreover, it appears the defendant has no standing to contest the search of Ms. Smith's car or the seizure of any item in it.  Fourth Amendment rights are "personal" and may not be asserted when police conduct is alleged to have violated the legitimate expectation of privacy of a third party.  See, e.g., Rakas v. Illinois, 439 U.S. 128, 133 (1978); United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002).

"A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  Rakas, 439 U.S. at 134.  In this case, Smith was the vehicle's driver and owner, and the defendant was merely a passenger.  Officer O'Connor located the gun after he received permission to search the car from Smith, and found the drugs after the defendant gave permission to pat down and search his jacket, also located in Smith's car. There is no basis for finding the search violated the defendant's Fourth Amendment rights.  See United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996) ("officers may search property without violating the Fourth Amendment if the owner or lawful custodian gives consent").

The Supreme Court's recent decision in Brendlin v. California, 127 S. Ct. 2400 (2007), does not require a different conclusion.  In Brendlin, the Court determined when police make a

traffic stop, the passenger in the car, like the driver, is "seized" under the Fourth Amendment. 127 S. Ct. at 2410.  This case does not involve a traffic stop; Smith had parked her vehicle, and both she and the defendant had exited it, before Officer O'Connor had approached them.  Moreover, Brendlin "did not assert that his Fourth Amendment rights were violated by the search of [the driver's] vehicle," a claim which apparently would have been unsuccessful based upon the Supreme Court's citation of Rakas v. Illinois. 127 S. Ct. at 2404.  Under these circumstances, the Court finds no basis for suppressing evidence seized from Smith's vehicle.

### Conclusion

The defendant's Motions to Suppress (Papers 12 and 20) and Motion to Dismiss (Paper 13) are DENIED.

SO ORDERED.

Dated at Brattleboro, Vermont, this 1st day of August, 2007.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge